UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CHARDAN CAPITAL MARKETS, LLC,

                      Plaintiff,                17-cv-4727 (PKC)

                -against-

                                          OPINION AND ORDER

NORTHWEST BIOTHERAPEUTICS, INC.,

                      Defendant.
-----------------------------------------------------------x
CASTEL, U.S.D.J.

        Plaintiff Chardan Capital Markets, LLC ("Chardan") has brought this diversity suit, asserting claims for quantum meruit, unjust enrichment, and breach of contract against defendant Northwest Biotherapeutics, Inc. ("Northwest"). Northwest has moved to dismiss the Amended Complaint. (Doc. 33). For the following reasons, Northwest's motion will be granted.

BACKGROUND

        Chardan provides specialized investment banking and brokerage services, services which include acting as a placement agent for entities seeking to sell specialized financial instruments to investors through private placements. (Amended Complaint ("AC") ¶ 5). In December 2016, Northwest and Chardan entered into an agreement, known as the "Placement Agency Agreement" and "the Agreement," for Chardan to act as Northwest's exclusive placement agent for a private offering of warrants and common stock. (AC ¶ 6; Doc. 26-1 at 2). For its services, Chardan was entitled to eight percent of the gross proceeds of the offering. (AC ¶ 8).

The Placement Agency Agreement contains a tail provision, which states as follows:

> In the event the Offering is completed, during the six months following the termination of the Engagement Letter by and between [Northwest] and [Chardan], dated December 20, 2016, any person or entity listed on <u>Schedule 1</u> to whom [Chardan] introduced [Northwest], or with whom there have been discussions or negotiations about an investment in [Northwest] during the term of [Chardan's] engagement on behalf of [Northwest], purchases securities from [Northwest], [Northwest] agrees to pay [Chardan] upon the closing of such transaction a cash fee in the amount that would otherwise have been payable to [Chardan] if such transaction occurred during the term of this Agreement.

(Doc. 26-1 at 21). Chardan successfully completed the private placement two days after entering into the Placement Agency Agreement. (AC ¶ 10).

Within a few months, Northwest entered into a contract to repurchase $11 million of convertible senior notes held by an investor. (AC ¶ 11). This repurchase agreement required Northwest to raise capital. (AC ¶ 12). On March 10, 2017, Northwest purportedly told Chardan that it "intended to use Chardan as its exclusive placement agent to again raise capital" through the private placement of common stock and pre-funded warrants amounting to 28.8 million shares of common stock, which was approximately 15.4% of Northwest's equity, in exchange "for the same customary 8% fee as in the Placement Agency Agreement." (AC ¶¶ 12, 13; Doc. 34-2 at 19; Doc. 34-3 at 6). Chardan allegedly "immediately went to work" and "swiftly obtained financing commitments from investors of $6.2 [million]" over the next two days, with no investor to acquire more than a five percent interest in Northwest. (AC ¶¶ 12, 13). During this time, Northwest purportedly "repeatedly assured Chardan that it would be the exclusive placement agent." (AC ¶ 13).

Chardan alleges that on March 12, 2017, Northwest informed Chardan that Northwest had contracted with another entity to serve as its exclusive placement agent for the March private placement. (AC ¶ 14). The new placement agent raised an unspecified amount of funds, with over $3 million of the raised funds allegedly received from investors on Schedule 1 of the Placement Agency Agreement. (AC ¶ 14). The new placement agent purportedly raised these funds by "utiliz[ing] the same pricing and terms that Chardan had developed" for the March private placement. (AC ¶ 14). Chardan believes that "some of the investors who partook in the deal with the other placement agent in March 2017 were also contemplated as investors in the aborted Chardan placement." (AC ¶ 14).

Approximately two weeks later, Chardan, in an email, demanded payment from Northwest for unspecified services. (AC ¶ 17; Doc. 34-5 at 3).[1] Northwest replied that Chardan "will get paid every cent [it] [is] owed" but that Northwest could not "write a single check for [the owed] amount." (AC ¶ 17). After a single payment to Chardan of $50,000, Northwest did not make another payment. (AC ¶ 18).

Chardan brought this suit, asserting that Northwest unfairly benefitted from Chardan's services that it provided in good faith reliance on Northwest's assurances that Chardan would serve as Northwest's exclusive placement agent for the March private placement. (AC ¶¶ 19–28). Chardan contends that, as a result, it has viable quantum meruit and unjust enrichment claims. (AC ¶¶ 19–28). Chardan also maintains that Northwest breached the tail

---

[1] Chardan has quoted only select lines from this email. Northwest, in a declaration supporting its motion to dismiss, has attached the entire email. On a motion to dismiss, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in [the complaint] by reference" as well as documents that are integral to the complaint. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)). A document is integral to a complaint if the complaint "relies heavily upon its terms and effect." Id. (quoting DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)). Chardan relies heavily on the terms and effect of this email, arguing that it contains an admission of Northwest's payment obligation to Chardan that removes Chardan's quantum meruit and unjust enrichment claims from New York's Statute of Frauds. The Court will thus consider the entire email.

provision of the Placement Agency Agreement by refusing to pay Chardan eight percent of the capital raised in the March private placement from the individuals on Schedule 1 of the Placement Agency Agreement. (AC ¶ 29–36). Northwest has moved under Rule 12(b)(6), Fed. R. Civ. P., to dismiss the Amended Complaint.

LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing such a motion, the Court disregards legal conclusions, examines only the well-pleaded factual allegations, which the Court accepts as true, and draws all reasonable inferences in the plaintiff's favor. See id. at 678–79; Starr Int'l Co. v. Fed. Reserve Bank of N.Y., 742 F.3d 37, 40 (2d Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Austin v. Town of Farmington, 826 F.3d 622, 630 (2d Cir. 2016) (quoting Iqbal, 556 U.S. at 678). "'[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' however, dismissal is appropriate." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

DISCUSSION

I. Quantum Meruit (First Cause of Action) and Unjust Enrichment (Second Cause of Action) Claims

Northwest asserts that application of New York's Statute of Frauds warrants dismissal of Chardan's quantum meruit and unjust enrichment claims. Under New York's Statute of Frauds, certain agreements are unenforceable "unless [the agreement] or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by

his lawful agent." N.Y. Gen Oblig. Law § 5-701(a). One such agreement subject to this requirement is "a contract," either "implied in fact or in law," "to pay compensation for services rendered in . . . negotiating the purchase, sale, [or] exchange . . . of a business opportunity, business, . . . or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest." Id. § 5-701(a)(10). The New York Court of Appeals has made clear that section 5-701(a)(10) applies to claims for quantum meruit and unjust enrichment. Snyder v. Bronfman, 13 N.Y.3d 504, 508 (2009).

Chardan argues that section 5-701(a)(10) is inapplicable for several reasons, none of which is persuasive. First, it claims that section 5-701(a)(10) does not apply to the sale of an interest in a business comprising, as here, "less than a controlling interest, with no right to affect the policies of the business." (Doc. 40 at 13–14). But Chardan's view of section 5-701(a)(10) is inconsistent with the language of that provision, which requires a writing for "services rendered in . . . negotiating the . . . sale . . . [of] *an* interest"—not a *controlling* interest—in a "business." § 5-701(a)(10) (emphasis added).

It is also belied by the purpose of section 5-701(a)(10). Section 5-701(10) serves "to prevent intermediaries, whose services can be performed 'in the course of a few and even momentary conversations,' from making false or exaggerated claims regarding their fees or commissions." Seneca Ins. Co. v. Morelli, No. 95 Civ. 10701 (JSM), 1996 WL 312230, at *2 (S.D.N.Y. June 10, 1996) (quoting Freedman v. Chem. Const. Corp., 43 N.Y.2d 260, 267 (1977)). It "protect[s] principals from 'unfounded and multiple claims for commissions,'" Freedman, 43 N.Y.2d 260, 266 (1977) (quoting 1949 Report of N.Y. Law Rev. Comm., p. 615) and ensures that controversies over entitlement to a commission are not "resolved by juries on conflicting testimony, with the consequent danger of erroneous verdicts," Intercontinental

Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 383 (1969) (quoting 1949 Report of N.Y. Law Rev. Comm., p. 615). These concerns, which are the underpinnings of section 5-701(a)(10), are present regardless of whether a controlling interest is at issue.

Other applications of section 5-701(a)(10) also suggest that it is irrelevant whether the sale of a controlling interest is the subject of the negotiation.[2] For example, section 5-701(a)(10) applies to "a contract to pay compensation for services rendered in negotiating a loan." § 5-701(a)(10); see also Rosbach v. Indus. Trading Co., 81 F. Supp. 2d 522, 524 (S.D.N.Y. 2000) (holding that a purported oral contract to negotiate an $80,000 loan was governed by section 5-701(a)(10)); Belotz v. Jefferies & Co., No. 98 Civ. 2587 (LAP), 1999 WL 587916, at *3 (S.D.N.Y. Aug. 4, 1999), aff'd, 213 F.3d 625 (2d Cir. 2000) (holding that a purported oral contract to negotiate a $15 million bridge loan was governed by section 5-701(a)(10)). A loan, of course, is a form of financing that does not transfer any equity interest, much less a controlling one. Nevertheless, it is governed by section 5-701(a)(10), indicating that the extent of control transferred has little or no bearing on the purpose and applicability of section 5-701(a)(10).

This conclusion is bolstered by the fact that the New York legislature specifically extended the reach of section 5-701(a)(10) to "includ[e] the creating of a partnership interest." A partnership interest might include the right to control the business, but it might not. Indeed, an entire type of partnership interest—the interest held by a limited partner in a limited partnership—is premised on the partner refraining from "participat[ing] in the control of the

---

[2] Chardan relies heavily on a New York trial-court decision from over fifty years ago, Clivner v. Ackerman, 274 N.Y.S.2d 112 (Sup. Ct. 1966), aff'd without opinion, 291 N.Y.S.2d 759 (1st Dep't 1968), as well as two out-of-circuit cases citing Clivner, Arsham v. Banci, 511 F.2d 1108 (6th Cir. 1975) and Hiller v. Franklin Mint, Inc., 485 F.2d 48 (3d Cir. 1973). These decisions are not binding, see Calvin Klein Ltd. v. Trylon Trucking Corp., 892 F.2d 191, 195 (2d Cir. 1989), and, to the extent that these cases held that negotiations of an interest in a business are not within section 5-701(a)(10) unless that interest is controlling, the Court declines to follow those holdings for the reasons stated in this opinion and order.

business." N.Y. P'ship Law § 121-303(a). Under any reasonable reading of section 5-701(a)(10), a purported oral contract to negotiate the creation of such an interest would be governed by section 5-701(a)(10) even though the limited partner could not, consistent with its limited partner status, control the business.

This Court concludes that section 5-701(a)(10) applies regardless of whether a controlling business interest is the subject of the negotiation. The equity interest sold in the March private placement constitutes "an interest" in a "business" for purposes of section 5-701(a)(10).

Second, Chardan asserts that section 5-701(a)(10) does not apply because the services it provided were not "rendered in . . . negotiating" a business interest within the meaning of section 5-701(a)(10). Chardan's briefing on this point addresses services that it provided before the March private placement, services which do not form the basis of any claim in the Amended Complaint and which Chardan never alleges it provided in reliance on a representation that it would receive payment. (See AC ¶¶ 19–36; Doc. 40 at 14–15).

Chardan does not contend, nor could it, that the purported services that actually do form the basis of its quantum meruit and unjust enrichment claims were not "rendered in [a] negotiati[on]." The term "negotiating" is defined in section 5-701(a)(10) to "include[] procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." The New York Court of Appeals has clarified that if services are "performed as part of or in furtherance of negotiation," they are "rendered in negotiating" for purposes of section 5-701(a)(10). JF Capital Advisors, LLC v. Lightstone Grp., LLC, 25 N.Y.3d 759, 766 (2015). In accordance with this principle, courts within this district have held that the following services, for example, fall within the scope of section 5-701(a)(10): performing due diligence

and financial analysis for a transaction covered by section 5-701(a)(10), seeking out and interacting with potential sources of financing, preparing presentations for potential investors, and developing a general negotiating strategy for accomplishing any proposed transactions. See Ely v. Perthuis, No. 12 Civ. 1078 (DAB), 2013 WL 411348, at *3–4 (S.D.N.Y. Jan. 29, 2013); GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d 308, 324 n.5 (S.D.N.Y. 2009); Zeising v. Kelly, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001).

In support of its quantum meruit and unjust enrichment claims, Chardan alleges that it "review[ed] and analyze[d] [Northwest's] finances and . . . locate[d] potential investors to subscribe for securities." (AC ¶ 12). Additionally, it "tested and assessed the marketplace and advised [Northwest] on pricing and the structure for the placement of securities." (AC ¶ 12). These services fall squarely within section 5-701(a)(10).

Finally, Chardan seeks to avert dismissal of its quantum meruit and unjust enrichment claims by pointing to Northwest's statement in an email to Chardan that Chardan "will get paid every cent [it] [is] owed," asserting that Northwest, in this statement, acknowledged Chardan was owed in connection with the March private placement and, thus, that section 5-701(a)(10) is inapplicable. (AC ¶ 17). For a written statement to satisfy the writing requirement of section 5-701(a)(10), the written statement must "evidence the fact of plaintiff's employment by defendant to render the alleged services." Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 575–76 (1969). A written statement does not do so "unless the 'full intention of the parties can be ascertained from it alone, without recourse to parol evidence.'" Dahan v. Weiss, 991 N.Y.S.2d 119, 120 (2d Dep't 2014) (quoting Cooley v. Lobdell, 153 N.Y. 596, 600 (1897)).

Although it is reasonable to infer from this statement that Northwest believed it was obligated to pay Chardan for *some* service, the statement, even when placed in the context of

the remainder of the email, does not indicate what services Northwest believed required payment.[3] In other words, it leaves "ambiguity as to whether the [purported] agreement's terms cover[] the transaction upon which [the] fee [is] claimed." Springwell Corp. v. Falcon Drilling Co., 16 F. Supp. 2d 300, 306 (S.D.N.Y. 1998). Because the full intent of the parties cannot be ascertained from this email alone, the email does not suffice as a "note or memorandum" that removes Chardan's quantum meruit and unjust enrichment claims from the strictures of section 5-701(a)(10). Both claims will be dismissed.

II. Breach of Contract Claim (Third Cause of Action)

Chardan asserts that Northwest breached the tail provision of the Placement Agency Agreement by failing to pay Chardan eight percent of the proceeds raised from three institutional investors that invested in the March private placement and were introduced to Northwest in the December private placement. The Court disagrees.

As noted, the tail provision provides that

> [i]n the event the Offering is completed, during the six months following the termination of the Engagement Letter by and between [Northwest] and [Chardan], dated December 20, 2016, any person or entity listed on Schedule 1 to whom [Chardan] introduced [Northwest], or with whom there have been discussions or negotiations about an investment in [Northwest] during the term of [Chardan's] engagement on behalf of [Northwest], purchases securities from [Northwest], [Northwest] agrees to pay [Chardan] upon the closing of such transaction a cash fee in the amount that would otherwise have been payable to [Chardan] if such transaction occurred during the term of this Agreement.

---

[3] Indeed, it appears that Chardan is not even certain of which services Northwest believed it "owed" Chardan payment: Chardan alleges in support of its breach of contract claim that Northwest "acknowledged its obligation under Section 9(b) of the Placement Agency Agreement,"—that is, under the tail provision of the Placement Agency Agreement—"but to date has paid only the sum of $50,000 to Chardan." (AC ¶ 33).

(Doc. 26-1 at 21). This dense provision appears to be missing words, and the parties construe it two different ways in their briefing.[4] But the parties' principal dispute centers upon the meaning of the word "termination" in the phrase "termination of the [Placement Agency Agreement]." Northwest urges that the Placement Agency Agreement was not "terminat[ed]" and that, thus, the tail provision does not apply.

Chardan argues that, in addition to certain situations in which the Placement Agency Agreement authorizes Chardan to terminate the agreement, the Placement Agency Agreement also "terminates by its own term[s], either on the closing of the Offering, or on the failure to have a successful closing 'as soon as practicable . . . but not later than December 27, 2016.'" (Doc. 40 at 22) (second alteration in original)). The Placement Agency Agreement, however, nowhere states that it terminates in either of these situations. Rather, in these situations, Chardan and Northwest would have either fulfilled some of their obligations or no longer been required to fulfill those obligations, but the Placement Agency Agreement as a whole would remain in effect. Cf. Rochdale Vill., Inc. v. Pub. Serv. Emp. Union, Local No. 80, 605 F.2d 1290, 1297 (2d Cir. 1979) ("If the contract allows a party to terminate unilaterally, a proper 'repudiation' ends the contract and the parties' contractual obligations."); see also Fisher v. Tice, 692 F. App'x 54, 56 (2d Cir. 2017) (summary order) (stating that because "[o]nce [a] joint venture terminates so do the parties' obligations to one another," the defendant's actions after the termination of the joint venture "could not have breached her contract").

---

[4] Neither party explains whether "the Engagement Letter," a capitalized, and presumably defined, term, is different than the "Placement Agency Agreement," which is defined in the Placement Agency Agreement, and referred to throughout, as the "Agreement." (Doc. 26-1 at 2). Despite indications that it is a defined term, it is not defined in the Placement Agency Agreement. But because both parties proceed on the assumption that the Engagement Letter is the Placement Agency Agreement, and because the Placement Agency Agreement is a type of engagement letter, the Court will do so as well. (See Doc. 35 at 27; Doc. 40 at 22–23).

Implicit in Chardan's argument is that the phrase "termination of the [Placement Agency Agreement]" means the termination of some obligations but not of others, including, notably, the Northwest's obligations under the tail provision. If that were not the case, then Chardan would not have a viable claim because the tail provision would have terminated and become unenforceable. Chardan's construction of the Placement Agency Agreement is implausible. Not only is it inconsistent with the tail provision—which speaks in terms of the "termination" of the Agreement, not of a fraction of the obligations in the Agreement—but it is also undermined by the other provisions in the Placement Agency Agreement that do address termination of the Agreement.

Section 6 of the Placement Agency Agreement provides that if certain conditions are not satisfied, then "this Agreement may be terminated by [Chardan] by notice to [Northwest]." (Doc. 26-1 at 17). If Chardan were to terminate the Placement Agency Agreement under this section, the termination would "be without liability on the part of any party to any other party, except that Section 5, Section 7 and Section 9"—which contains the tail provision—"shall at all times be effective and shall survive such termination." (Doc. 26-1 at 17 (emphasis in original)). Similarly, section 7 provides that "[t]he indemnity and contribution agreements of the parties contained in this Section 7 and the covenants, warranties and representations of [Northwest] contained in this Agreement shall remain operative and in full force and effect regardless of . . . any termination of this Agreement." (Doc. 26-1 at 20 (emphasis in original)). And section 9 states that Chardan may terminate the Placement Agency Agreement if certain events occur and that "[a]ny such termination shall be without liability of any party to any other party except that the provisions of Section 5, Section 7, Section 9(b)"—the

tail provision—"and <u>Section 12</u> hereof shall at all times be effective notwithstanding such termination." (Doc. 26-1 at 21 (emphasis in original)).

These provisions show that the parties viewed termination of the Placement Agency Agreement as terminating all contractual rights and obligations, as evidenced by their apparent belief that they needed to specify that certain sections survived the termination of the agreement. It also shows that if the parties wished for a specific provision to survive termination of the Placement Agency Agreement, they knew how to do so and would include language to that effect. Yet the parties did not specify that any provision was to survive the purported "termination" of the Placement Agency Agreement by the closing of the offering or the failure to close the offering by December 27, 2017.

Significantly, the parties also distinguished between termination of the Placement Agency Agreement and the successful placement of the securities. They agreed that "[t]he indemnity and contribution agreements of the parties contained in this <u>Section 7</u> and the covenants, warranties and representations of the Company contained in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement . . . and (iii) the issuance and delivery of the Securities." (Doc. 26-1 at 20 (emphasis in original)). This strongly suggests that the parties did not consider the performance of the Agreement, *i.e.* the issuance and delivery of securities, to equate to the "termination" of the Agreement.

Chardan does not have a plausible claim for breach of the tail provision. Its breach of contract claim will be dismissed.

CONCLUSION

For the foregoing reasons, Northwest's motion to dismiss the Amended Complaint is GRANTED. (Doc. 33). Northwest's motion for oral argument is DENIED as moot. (Doc. 36).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
August 6, 2018